IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

STEELWORKERS PENSION TRUST )
By DANIEL A. BOSH, CHAIRMAN )
                            )
        Plaintiff,          )
                            )
    v.                      )    C.A. No. 16-190
                            )
THE RENCO GROUP, INC., ILSHAR )
CAPITAL LLC, BLUE TURTLES, INC., )
UNARCO MATERIAL HANDLING, INC., )
ITEVA PRODUCTS LLC, THE DOE RUN )
RESOURCES CORPORATION, and  )
USMAGNESIUM LLC,            )
                            )
        Defendants.

**MEMORANDUM OPINION & ORDER**

Presently pending before the Court is Plaintiff's Motion to Disqualify Law firm of Proskauer Rose, LLP [ECF No. 23]. For the reasons stated herein, said motion will be denied.

**I. Background**

Steelworkers Pension Trust by Daniel A. Bosh, Chairman (the "SPT") initiated this action on February 22, 2016. The SPT is a multi-employer pension plan making a withdrawal liability claim pursuant to the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1401(b). The MPPAA was enacted because Congress found that existing statutes "did not adequately protect plans from the adverse consequences that resulted when individual employers terminate[d] their participation in, or withdr[e]w from, multiemployer plans." *Pension Ben. Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 722 (1984). The MPPAA addressed this problem by assessing such employers with withdrawal liability,

1

defined in the statute as the employer's adjusted "allocable amount of unfunded vested benefits." *Flying Tiger Line v. Teamsters Pension Trust Fund of Philadelphia,* 830 F.2d 1241, 1243–44 (3d Cir.1987) (citing 29 U.S.C. § 1381(b)(1) (1982)).

Provisions for the quick and informal resolution of withdrawal liability disputes are an integral part of MPPAA's statutory scheme. *Flying Tiger,* 830 F.2d at 1244. The MPPAA requires a plan's trustees to determine initially whether a withdrawal has occurred. 29 U.S.C. §§ 1382(1), 1399(b)(1)(A)(i). When the trustees conclude that a withdrawal has taken place, they must then notify the employer of the amount of liability and demand payment in accordance with an amortization schedule. 29 U.S.C. §§ 1382(2), 1382(3), 1399(b)(1)(B). The Notice must include the amount of liability and a schedule of installment payments, and the withdrawn employer must begin paying according to the schedule. *See Robbins v. Pepsi–Cola Metro. Bottling Co.,* 800 F.2d 641, 642–43 (7th Cir.1986) (per curiam); *see also Penske Logistics, LLC v. Freight Drivers & Helpers Local Union No. 557,* 2009 WL 1383298, at *2 (E.D. Pa. 2009). Thereafter, the employer may within ninety days ask the trustees to conduct a reasonable "review" of the computed liability. 29 U.S.C. § 1399(b)(2)(A)(i) (1982). If a dispute remains after the plan sponsor responds, either party may initiate arbitration proceedings within sixty (60) days. The MPPAA provides that

> [a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of ... this title shall be resolved through arbitration. Either party may initiate the arbitration proceeding within a 60–day period.

29 U.S.C. § 1401(b)(1). Finally, "[u]pon completion of the arbitration proceedings in favor of one of the parties," MPPAA permits "any party thereto" to bring an action "to enforce, vacate or modify the arbitrator's award" in the appropriate federal district court. *Flying Tiger Line,* 830

F.2d at 1244 (quoting 29 U.S.C. § 1401(b)(2) (1982)); *Swerdlick v. Am. Compressed Gases, Inc.*, No. CIV.A. 14-04774 CCC, 2015 WL 1422046, at *3-4 (D. N.J. Mar. 26, 2015)

Into this statutory scheme this case falls. The following facts are stated as alleged in the Amended Complaint, or as appear in the limited record. In March 2011, Defendant The Renco Group, Inc. ("Renco") purchased RG Steel and thereafter owned 100% of it. Renco is a private holding company; Defendants, Ilshar Capital LLC, Blue Turtles, Inc., Unarco Material Handling, Inc., Inteva Products LLC, the Doe Run Resources Corporation and US Magnesium LLC are subsidiaries of Renco. Under ERISA with respect to controlled group liability, these defendants are considered sister companies of RG Steel since they are all owned by Renco. Collectively with Renco Defendants are members of and referred to as the "Renco Controlled Group."

Both before and after Renco's purchase, RG Steel was a contributing employer to the SPT. On January 17, 2012, less than a year after purchasing RG Steel, Renco passed 24.5% equity in RG Steel to a subsidiary of Cerberus Capital Management, LP ("Cerberus"), thus reducing its ownership in RG Steel from 100% to 75.5% (the "Cerberus Transaction"). By reducing its ownership below 80%, according to SPT, Renco believed that it removed RG Steel from the Renco Controlled Group as ERISA provides that one is part of an entity's controlled group if it possesses at least 80% of the shares of all classes of stock in that entity. 26 C.F.R. §1.414(c)-2(b)(2). That reduction in ownership was critical to Renco, it is alleged, because otherwise it would be liable for any withdrawal liability that would be triggered by RG Steel. 29 U.S.C. §1301(b)(1).

Five months later on May 31, 2012 RG Steel filed a Chapter 11 Bankruptcy Petition (the "RG Steel Bankruptcy") in the United States District Court for the District of Delaware. It substantially ceased its steelmaking operations, thereby triggering withdrawal liability to the SPT

of over $86 million. 29 U.S.C. §1383. SPT intends to prove that a principal purpose of Renco "pushing" 24.5% equity onto Cerberus was to allow Renco to "evade or avoid" that withdrawal liability because ERISA provides that if "a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied and [withdrawal] liability shall be determined and collected without regard to such transaction." 29 U.S.C. §1392(c). If the transaction is disregarded, it results in Renco remaining the 100% owner of RG Steel at the time of RG Steel's complete withdrawal from the SPT. Thus, Defendants would be jointly and severally liable for the entire RG Steel withdrawal liability. 29 U.S.C. §1301(b)(1).

On June 1, 2012 (the first day after the RG Steel Bankruptcy was filed), four attorneys for Renco entered their appearances in the RG Steel Bankruptcy. Three of those attorneys worked with Michael Ryan at Cadwalader, Wickersham & Taft, LLP. Another attorney from that same firm was admitted pro hac vice sometime later. On September 24, 2012, the SPT submitted Proofs of Claim for the withdrawal liability in the RG Steel Bankruptcy to the bankruptcy court-appointed "Claims and Noticing Agent", Kurtzman Carson Consultants, LLC ("KCC"), which in turn included them in a Claims Register that it filed on the bankruptcy docket on January 11, 2013. SPT alleges that Renco had anticipated the SPT Proofs of Claim because substantial withdrawal liability to the SPT would have been discovered through due diligence or otherwise in relation to the acquisition of RG Steel assets in 2011. SPT further posits that once RG Steel ceased steelmaking operations and filed for bankruptcy protection, Renco would have fully anticipated the SPT's withdrawal liability claim.

The Proofs of Claim provided to KCC included both the total amount of the withdrawal liability and the SPT's independent actuary's explanation of the withdrawal liability calculation. SPT further alleges that the Claims and Noticing Agent made RG Steel and/or its counsel and

4

Renco and/or its counsel aware of the SPT's Proofs of Claim by providing copies shortly after they were received by KCC. SPT's Proofs of Claim appeared on the exact same page of the Numerical Claims Register and next to the proofs of claim that Defendants Renco and Ilshar Capital filed in the RG Steel Bankruptcy. That Claims Register was emailed by the Delaware Bankruptcy Court via the ECF system to all attorneys whose appearances had been entered in the RG Steel Bankruptcy.

The purpose of the Claims and Noticing Agent's filing of the Claims Register was to give all of the parties actual notice of the proofs of claims filed in the RG Steel bankruptcy. SPT further alleges Renco and the Renco Controlled Group received actual notice of the SPT Notice and Demand on January 11, 2013, because three of Renco's attorneys, whose appearances were entered in the RG Steel Bankruptcy, received the Claims Register via the ECF system. It is alleged that three other attorneys who were not in the ECF system but had entered their appearances in the RG Steel Bankruptcy received the Claims Register by regular mail shortly after it was filed. The SPT Proofs of Claim were also included in two additional Claims Registers filed by Claims and Noticing Agent in 2013, one on April 8, 2013, and one on July 17, 2013, purportedly providing Renco and the Renco Controlled Group with actual notice of the SPT's Notice and Demand on those dates as well. SPT alleges that Renco and the Renco Controlled Group knew that the SPT's Proofs of Claim pertained to withdrawal liability because they had specifically structured the Cerberus Transaction to try to evade and avoid such withdrawal liability to the SPT, and because they were already involved in discussions with the Pension Benefit Guarantee Corporation ("PBGC") regarding withdrawal liability for the single-employer pension plans, and knew that there would inevitably be a claim.

According to SPT's reading of the law, submission of the Claims Register on January 11, 2013 constituted Notice and Demand by the SPT, and triggered a 90 day clock for Defendants to file a Request for Review if they wanted to contest RG Steel's status in their controlled group. 29 U.S.C. §1399(b)(2)(A). If a Request for Review did not resolve all of the issues, any disputes were required to be resolved through arbitration. 29 U.S.C. §1401(a)(1). However, a party is required to timely request a review and initiate arbitration, or it will be deemed to have waived all issues it could have arbitrated. 29 U.S.C. §1401(a)(1). Consequently, the amounts assessed by the plan sponsor would be "due and owing." 29 U.S.C. §1401(b)(1). SPT asserts that Renco did not submit a timely "Request for Review" under ERISA 4219(b)(2)(A), 29 U.S.C. 1399(b)(2)(A), following actual notice of the SPT's Notice and Demand for withdrawal liability. Consequently Renco did not submit a timely "Demand for Arbitration" under ERISA 4221(a)(1), 29 U.S.C. § 1401(a)(1), because a prerequisite to filing a timely Demand for Arbitration is the filing of a timely Request for Review.

On January 28, 2013, the PBGC filed an action against the Renco Controlled Group for the unfunded pension liabilities of RG Steel in the U.S. District Court for the Southern District of New York alleging that Renco acted with the fraudulent intent to prevent the PBGC from terminating the single-employer pension plans and that a principal purpose of the Cerberus Transaction was to evade unfunded pension liabilities. The case went to trial in December 2015 and settled prior to the Court's decision; Renco settled the case by guaranteeing all of the single-employer pension funds.

The SPT asserts that PBGC action alerted Renco and the Renco Controlled Group of the existence of similar withdrawal liability claims by the SPT. On August 30, 2013 counsel for Renco wrote to the SPT acknowledging Renco awareness of the SPT's Proofs of Claim and

attempted to submit a Request for Review. SPT alleges that Renco's Request for Review was untimely because it was submitted more than 90 days after Renco received actual and/or construction notice of the SPT's Notice and Demand. In the August 30, 2013, letter, counsel for Renco declined to identify the date that Renco had received actual notice of the Proofs of Claim.

On February 14, 2014, the SPT, RG Steel Holdings LLC and the Renco Controlled Group entered into a Tolling Agreement. The Tolling Agreement tolled any Arbitration Demand Period that Renco may have had as of January 28, 2014. However, the Tolling Agreement reserved all of the SPT's rights to enforce withdrawal liability, including the SPT's right to contend that it had already issued a Notice and Demand to Renco and that the opportunity for Renco to demand review or arbitration had already passed. A Tolling Agreement Extension was entered into by the same parties on January 28, 2015. The SPT explains it entered into the Tolling Agreements since the PBGC's lawsuit against Renco was much further along and a win for the PBGC could have acted as collateral estoppel in favor of the SPT. A finalized and executed settlement agreement between Renco and the PBGC was entered into on March 2, 2016. [ECF No. 33-1].

This action was initiated on February 22, 2016, and the Amended Complaint[1] was filed on May 13, 2016. [ECF No. 33]. On April 20, 2016, SPT moved to disqualify co-counsel for Renco, Proskauer Rose LLP ("Proskauer"). [ECF No. 23]. In the Motion to Disqualify and supporting brief [ECF No. 24], STP asserts that Proskauer has for many years represented, and currently represents, well over a dozen multi-employer defined benefit pension plans ("Union Pension Plans") like the SPT for, among other things, their collection of withdrawal liability

---

[1] SPT has taken the position that it will not engage in arbitration and instead moves to enjoin that proceeding: on April 8, 2016, SPT filed a Motion to Stay the Arbitration. [ECF No. 20]. On April 22, 2016, Renco moved to dismiss the Complaint. [ECF No. 26]. While those motions are fully briefed and ripe for disposition, they are not addressed herein, and will be addressed separately in due course.

from contributing employers and their controlled group members. STP argues that Proskauer has asserted legal arguments that will, if successful, create a precedent likely to seriously weaken its prosecution of claims on behalf of its Union Pension Plans. Renco opposes the motion and has filed a brief in opposition [ECF No. 32] with supporting documentation, challenging SPT's standing and denying that its representation herein is adverse to the interests of its multiemployer pension plan clients. SPT has filed a reply brief. [ECF No. 35].

II. Discussion

SPT asserts that because a conflict of interest exists under the Pennsylvania Rules of Professional Conduct 1.7, discussed more fully *infra,* Proskauer should be disqualified from representing the Defendants in this case.    First, however, we must address Renco's argument that SPT lacks standing to seek its disqualification even though SPT is not a current or former client of Proskauer. The parties agree that there is no binding precedent from the United States Court of Appeals for the Third Circuit. SPT asserts it has standing by citing dicta from *In re Pressman-Gutman Co., Inc*., 459 F.3d 383, 402 n.20 (3d Cir. 2006). There, the Court looked favorably on decisions from the First and Fifth Circuits allowing opposing counsel to move for disqualification on a conflict of interest basis even though the moving attorney does not represent the conflicted current or former client. The court noted in dicta that "several courts of appeals have jettisoned rigid standing rules to allow opposing counsel to move for disqualification even though the movant does not represent the aggrieved client," citing *Kevlik v. Goldstein*, 724 F.2d 844, 848 (1st Cir. 1984); *Brown & Williamson Tobacco Corp. v. Daniel Int'l Corp.,* 563 F.2d 671, 673 (5th Cir. 1977). The Court also mentioned this conclusion is contemplated by both the American Bar Association's Model Rules of Professional Conduct, *see* Model Rules of Prof. Conduct R. 1.7 cmt. (2002), and the Pennsylvania Rules of Professional Conduct, see Pa. R.P.C.

1.7 cmt. (2002) (stating that opposing counsel properly may raise disqualification "[w]here the conflict is such as clearly to call in question the fair or efficient administration of justice").

At least one district court in our Circuit has expressly ruled that a party other than a client or former client does not have standing to seek disqualification of an adverse attorney. *See Shire Labs., Inc. v. Nostrum Pharms., Inc.,* 2006 WL 2129482, at *4 (D. N.J. July 26, 2006). We are nevertheless guided by the holding in *United States v. Miller,* 62 F.2d 1198, 1201 (3d Cir.1980) wherein the court held that a court has the power to disqualify an attorney based on its inherent authority to supervise the professional conduct of attorneys appearing before it. Additionally, the Third Circuit has recognized that counsel has a responsibility, if not a duty, to alert the court to ethical conflicts, noting that the obligation to ensure ethical compliance has led other courts to rule that counsel has standing to raise and challenge unethical procedures on the part of opposing lawyers. *Century Indemnity Co. v. Congoleum Corp.* 426 F.3d 675, 686-87 (3d Cir. 2005)   We therefore find that SPT has standing to bring the motion to disqualify.

Next, we address the merits of the disqualification request. "Although disqualification ordinarily is the result of a finding that a disciplinary rule prohibits an attorney's appearance in a case, disqualification never is automatic." *Miller,* 624 F.2d at 1201. "[T]he court should disqualify an attorney only when it determines, on the facts of the particular case, that disqualification is an appropriate means of enforcing the applicable disciplinary rule." *Id.* In making this determination, the Court "should consider the ends that the disciplinary rule is designed to serve and any countervailing policies, such as permitting a litigant to retain the counsel of his choice and enabling attorneys to practice without excessive restrictions." *Id.* Based on their frequent use as a tactical device, "[m]otions to disqualify are generally disfavored and, therefore, require the movant to show *clearly* that continued representation would be

impermissible." *Madukwe v. Delaware State Univ.,* 552 F.Supp.2d 452, 457 (D. Del. 2008) (quotation marks and citations omitted) (emphasis added). "Disqualification questions are intensely fact-specific, and it is essential to approach such problems with a keen sense of practicality as well as a precise picture of the underlying facts." *Carlyle Towers Condo. Ass'n, Inc. v. Crossland Sav., FSB,* 944 F.Supp. 341, 345 (D. N.J.1996) (citations omitted). "Because disqualification during pending litigation is an extreme measure, courts must closely scrutinize the facts of each case to avoid injustice." *In re Cendant Corp. Securities Litigation*, 124 F. Supp.2d 235, 249 (D. N.J. 2000). Notably, "ethical rules should not be blindly applied without consideration of the relative hardships." *Carlyle Towers*, 944 F.Supp. at 345 (quoting *Gould, Inc. v. Mitsui Min. & Smelting Co.,* 738 F.Supp. 1121, 1124 (N.D. Ohio 1990)); *see also Cendant Corp.*, 124 F.Supp.2d at 249 ("courts must closely scrutinize the facts ... [and] balance the hardships to the client whose lawyer is sought to be disqualified against potential harm to the adversary should the attorney be permitted to proceed.").

As noted earlier, SPT has moved to disqualify Proskauer from representing defendants herein pursuant to Pennsylvania Rule of Professional Conduct 1.7, which tracks the ABA Model Rule of Professional Conduct. Model Rule 1.7 "arises out of the fundamental proposition that an attorney owes a duty of undivided loyalty to his or her client." *Carlyle Towers*, 944 F.Supp. at 346. See also Model Rule 1.7 cmt. 1 ("[l]oyalty and independent judgment are essential elements in the lawyer's relationship to a client"). SPT provides "a sampling" of some of Proskauer's Union Pension Plan clients which purportedly reveals their deep involvement with multi-employer pension plans and withdrawal liability cases. SPT asserts that Proskauer should obtain conflict waivers from those clients, or be disqualified.

Comment 24 to the ABA Rule 1.7 informs our decision. It sets forth the factors relevant in determining when a lawyer or law firm takes a position in one proceeding that is at odds with its position in a different matter in another jurisdiction:

> (24) Ordinarily a lawyer may take inconsistent legal positions in different tribunals at different times on behalf of different clients. ***The mere fact that advocating a legal position on behalf of one client might create precedent adverse to the interests of a client represented by the lawyer in an unrelated matter does not create a conflict of interest.*** A conflict of interest exists, however, if there is a significant risk that a lawyer's action on behalf of one client will materially limit the lawyer's effectiveness in representing another client in a different case, for example, when a decision favoring one client will create a precedent likely to seriously weaken the position taken on behalf of the other client. Factors relevant in determining whether the clients need to be advised of the risk include: ***where the cases are pending, whether the issue is substantive or procedural, the temporal relationship between the matters, the significance of the issue to the immediate and long-term interests of the clients involved and the clients' reasonable expectations in retaining the lawyer.*** If there is significant risk of material limitation, then absent informed consent of the affected clients, the lawyer must refuse one of the representations or withdraw from one or both matters.

Am. Bar Ass'n Model Rules of Prof'l Conduct, Rule 1.7, Cmt. 24 (Emphasis added).

In response to the Motion to Disqualify, Proskauer has not presented conflict waivers, as SPT claims it should, but instead included in the record the sworn declaration of Myron D. Rumeld [ECF No. 32-1], partner with Proskauer and co-chair of both Proskauer's Employee Benefits and Executive Compensation Practice (the "EBEC") and its ERISA Litigation sub-group. Attorney Rumeld attests that he recently conducted a review of the litigation matters that Proskauer is currently handling for its multiemployer plan clients. He explains that EBEC is a nationally recognized employee benefits practice. Its clients include, among others, both multiemployer plans and contributing employers to such plans. Proskauer represents both multiemployer plans and contributing employers in withdrawal liability disputes. As a management-side firm, Proskauer routinely advocates positions that are adverse to unions on

11

labor matters; and it typically (though not always) represents its multiemployer plan clients as employer trustee designated co-counsel. [ECF No. 32-1 at ¶ 4].

Rumeld further declares Proskauer is presently handling nine withdrawal liability lawsuits on behalf of its multiemployer plan clients; Complaints in those matters have been included in the record herein. [ECF No. 32-1 at ¶ 5]. Rumeld explains "in none of these cases does Proskauer contend that defendants have waived their defenses by virtue of failing to assert them in timely fashion after receipt of a proof of claim in bankruptcy. See Exs. 1-9. Nor do any of these cases address in any way the adequacy of notice of a withdrawal liability assessment." [ECF No. 32-1 at ¶ 6]. In one of the nine cases, *Trustees of the Local 813 Pension Trust Fund, et al. v. Isabella City Carting Corp. et al.*, E.D.N.Y. Case No. 15-cv-05338, Proskauer asserts an "evade or avoid" theory on behalf of its multiemployer plan clients, Renco asserts that case differs from this one because it contains allegations that ownership of the contributing employer was transferred among family members—without consideration and without any independent economic impact on the relevant parties—shortly before the contributing employer ceased covered operations as a result of a revocation of its business license, which effected a withdrawal from the plaintiff plans. [ECF No. 32-8 at ¶¶ 16-17, 21, 30-41]. The Amended Complaint further alleges that there was no reason for the transfer of ownership other than avoidance of withdrawal liability. [ECF No. 32-1 at ¶ 7].

Based on our review of the record and the arguments of counsel, as well as the factors set forth in Comment 24 of the ABA Model Rules of Professional Conduct, SPT has not met its burden and identified any lawsuit that Proskauer is presently handling in which its clients' interests would be adversely affected if Renco prevailed on its argument as to the effect of the

filing of a proof of claim or an "evade or avoid" theory in these particular circumstances.[2] None of the nine lawsuits revealed by Proskauer were filed within the Third Circuit and none involve a contention that defendant has waived its defenses by virtue of having to failed to assert the defenses in a timely fashion after receipt of proof(s) of claim in bankruptcy. None of the lawsuits involves the adequacy of a withdrawal liability notice at all. The single lawsuit asserting an "evade or avoid" theory, *Trustees of Local 813 Pension Trust Fund*, which concerns allegations that ownership of a contributing employer was transferred among family members prior to revocation of its business license, is factually distinguishable and its outcome does not appear likely to have any relation on the outcome of the lawsuit herein.

We are mindful of SPT's argument that under ERISA, pension plans are restricted in their ability to identify current or former members of a contributing employer's controlled group, making it is "impossible" to say with certainty that the nine cases involving Proskauer clients do not involve former controlled group members who, like Renco is alleged to have done in this case, sold just enough equity shortly before a withdrawal was triggered. While this is theoretically possible, at this point in the litigation and given the standard applicable to the motion to disqualify, we see no "significant' risk that Proskauer's actions in this case will "materially limit" the firm's effectiveness in representing another client in a different case such that the attorney-client relationship should be severed. This would deprive the litigant of its retained counsel of choice. We assume that should Proskauer learn differently, its attorneys, as officers of the court and potential subjects to separate disciplinary proceedings would act accordingly with due regard to their ethical obligations in this or other matters.

---

[2] Nor do we see evidence that SPT's motion is motivated by purely tactical reasons.

Consequently, the Court in its discretion will allow Proskauer to continue as counsel for defendants in this matter, and the motion to disqualify will be denied. An appropriate order will be entered.

Any party wishing to appeal from this decision herein is advised that said appeal shall be filed within fourteen days of the date of the accompanying order, or the appeal will be deemed to have been waived.

DATED: July 7th, 2016                            /s/  *Robert C. Mitchell*
                                                                   Robert C. Mitchell
                                                                   United States Magistrate Judge

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEELWORKERS PENSION TRUST<br>By DANIEL A. BOSH, CHAIRMAN | )<br>)<br>) | |
| Plaintiff, | )<br>) | |
| v. | )<br>) | C.A. No. 16-190 |
| THE RENCO GROUP, INC., ILSHAR<br>CAPITAL LLC, BLUE TURTLES, INC.,<br>UNARCO MATERIAL HANDLING, INC.,<br>ITEVA PRODUCTS LLC, THE DOE RUN<br>RESOURCES CORPORATION, and<br>USMAGNESIUM LLC, | )<br>)<br>)<br>)<br>)<br>) | |
| Defendants. | | |

## **ORDER**

AND NOW, to-wit, this 7th day of July, 2016, for the reasons stated in the accompanying Memorandum Opinion, it is hereby ORDERED, ADJUDGED and DECREED THAT Plaintiff's Motion to Disqualify Law firm of Proskauer Rose, LLP [ECF No. 23] be and the same is hereby DENIED.

           /s/ *Robert C. Mitchell*
           Robert C. Mitchell
           United States Magistrate Judge